## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| ADAM EHRLICH | : | |
| A KENSINGTON JOINT LLC | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | NO. _____ |
| CITY OF PHILADELPHIA | : | |
| MAYOR CHERELLE PARKER | : | |
| MAYOR JAMES F. KENNEY (former) | : | |
| SGT. RYAN WONG | : | |
| OFFICER DYLAN MARNOCH | : | |
| OFFICER NICHOLAS LAZAR | : | |
| OFFICER BRITTNEY REHRIG | : | |
| LT. WANDA NEWSOME | : | |
| LAVANDA HARRIS | : | |
| | : | |
| *and* | : | |
| | : | |
| JOHN AND JANE DOE OFFICERS, | : | |
| AGENTS, OFFICIALS AND EMPLOYEES OF | : | |
| THE CITY OF PHILADELPHIA [1-100] | : | |

## COMPLAINT

Plaintiffs, **ADAM EHRLICH** and **A KENSINGTON JOINT LLC**, by and through undersigned counsel, hereby file this Complaint for damages arising out of violations of rights secured by the Constitution of the United States.

## INTRODUCTION

1.     This is an action brought pursuant to 42 U.S.C. § 1983 for damages occurring on August 01-02, 2023, arising out of violations of the Plaintiff's Second, Fourth, Fifth, and Fourteenth Amendment Rights secured by the Constitution of the United States, and for other related pendent State-law claims.

## PARTIES

2.      Plaintiff, **ADAM EHRLICH**, is forty-nine (49) year-old, United States citizen, residing within the Commonwealth of Pennsylvania having the address of 863 N. 25th Street, Philadelphia, PA 19130.  He is the owner of co-Plaintiff, A Kensington Joint LLC ("AKJ"), a Pennsylvania Limited Liability Company.

3.      Defendant, CITY OF PHILADELPHIA, is a municipal corporation of the First Class within the Commonwealth of Pennsylvania pursuant to Act of April 21, 1949, P.L. 665 Section 1 *et. seq*., and as such, operated as the county and city governmental body composed of duly elected or appointed public officials and administrators, who have been charged with the collectively sworn duty to exercise due diligence to protect the public within the geographical confines of the City and County of Philadelphia.

4.      While this Complaint alleges wrongdoing by: (a) the Office the Mayor and its respective agents; (b) the Office of the Managing Director and is respective agents; (c) the Philadelphia Police Department ("PPD") and its respective officers; (d) the Department of Licenses and Inspection ("L&I") and its respective employees, and the Office of Open Records ("OOR") and its respective employees, the properly named Defendant herein is the CITY OF PHILADELPHIA. Generally, a sub-division of a local government is not separate from the municipality of which it is a part and, accordingly, is not a proper defendant in a § 1983 action. *See, e.g*., Martin v. Red Lion Police Dep't, 146 F. App'x 558, 562 n.3 (3d Cir. 2005)

5.      Similarly, while this Complaint avers wrongdoing by the Philadelphia Office of the Sheriff ("PSO") the proper Defendant remains the CITY OF PHILADELPHIA.[1]

---

[1]  The Philadelphia Sheriff's Office is not a proper party under § 1983. In § 1983 actions, a police department cannot be sued "merely because it is an administrative arm of the local

6.      The individual Defendants, Lt. WANDA NEWSOME, Sgt. RYAN WONG ("Wong"), Officer DYLAN MARNOCH ("Marcnoch"), Officer NICHOLAS LAZAR ("Lazar") and Officer BRITTNEY REHRIG ("Rehrig"), at all times relevant to the averments contained herein, were police officers employed by the PPD who acted under color of state law.  Each is sued herein in their individual capacity.

7.      Similarly, current Mayor CHERELLE PARKER and former Mayor JAMES F. KENNEY are sued in their individual capacities as both were officials acting under color of state law at times relevant to this Complaint.

8.      Defendant, LAVANDA HARRIS was, at all times relevant to the averments contained herein, an employee of Philadelphia Sheriff's Office (i.e. CITY OF PHILADELPHIA) who acted under color of state law and is sued herein in her individual capacity.

9.      Defendant John & Jane Does [1-100], at all times relevant hereto, were either Philadelphia Police Officers, Philadelphia Sheriff's Deputies, or other city officials and/or agents employed by the CITY OF PHILADELPHIA each who were acting in both their respective individual and official capacities and under color of state law at the time of the events herein complained of.

---

municipality, and is not a separate judicial entity." Butts v. SCI-Camp Hill, No. 08-2259, 2009 U.S. Dist. LEXIS 6226, 2009 WL 222653, at *1 (M.D. Pa. January 29, 2009) (citing DeBellis v. Kulp, 166 F. Supp. 2d 255, 264 (E.D. Pa. 2001)). Hence, for the purposes of § 1983 liability, the Third Circuit has treated a municipality and its police department as a single entity. See Strunk v. East Coventry Tp. Police Dept., 674 Fed. Appx. 221, 225 (3d Cir. 2016); Bonenberger v. Plymouth Twp., 132 F.3d 20, 25 n.4 (3d Cir. 1997). "Suing the Philadelphia Sheriff's Office is also like suing the City of Philadelphia." Taylor v. Commonwealth, No. 17-3369, 2018 U.S. Dist. LEXIS 210370 (E.D. Pa. Dec. 12, 2018).

**STATEMENT OF VENUE AND JURISDICTION**

10.     This Court has jurisdiction pursuant to 28 U.S.C. § 1331 as this is a civil action arising under the Constitution and laws of the United States.

11.     Jurisdiction of this Court also arises under 28 U.S.C. § 1343(a) and 28 U.S.C. § 1367(a).

12.     Jurisdiction of the Court for any and all pendent claims is authorized by Fed. R. Civ. P. 18 (a) and also arises under the doctrine of pendent jurisdiction as set forth in United Mine Workers v. Gibbs, 383 U.S. 715 (1966).

13.     Venue is proper in the Eastern District of Pennsylvania pursuant to 28 U.S.C. § 1391(b)(2) insofar as the claims alleged herein occurred within the territorial jurisdiction of the Eastern District.

IV.     **FACTS**

14.     Plaintiff Adam Ehrlich ("Ehrlich") is engaged in the business of purchasing and selling properties and vacant land throughout the City of Philadelphia, with a notable interest and focus on the Kensington section of the City. Ehrlich has a longstanding civic connection to many neighborhoods throughout the City of Philadelphia with a particular focus on the Kensington area; having been honored in 2016 by Hon. Sheriff Jewell Williams and the Office of the City and County of Philadelphia in recognition of his service and community outreach.

15.     In 2020, shortly after the beginning of the COVID-19 pandemic "Bird in Hand LLC"  purchased a commercially-zoned, brick structure situated at 2837 Kensington Avenue, Philadelphia, Pennsylvania 19134 (the "Property").  At the time of purchase Ehrlich was sole or primary member of Bird in Hand LLC.

16.    Continuously, and prior to acquisition of the Property in 2020, an active, legal, continuous business, with archived permits dating back to 1911, had been operating for nearly a century until a mandatory pause of business activities were necessitated due to Pandemic related restrictions.

17.    The Property, upon information and belief, had residential space on the upper floors, as well as lower commercial space that had been 'Grandfathered' as approved use for XXX Videos, Adult Books, other items of an adult nature, as well as the rights of a Cabaret License.

18.    Due to the long running, continuous, legal operation of this risqué business, coupled with the brightly illuminated, decades old, city approved signage displaying the words "XXX VIDEO", the Property, as well as the neighboring properties and intersection,  a property were commonly known as, and referred to as the "Triple X,"

19.    On or about August 29, 2022, while 2837 Kensington Avenue had no open code violations, full utilities, and no pending enforcement actions, the City of Philadelphia unilaterally by and through its Department of Licenses and Inspections ("L&I") boarded and sealed the Property without conducting any internal inspection to ascertain if the Property was vacant, or if by sealing exits to the property without warning or notice would result in sealing individuals inside the property.

20.    At the time of the boarding, at least one individual, Terri Frame ("Frame"), was lawfully present inside the Property. She was left trapped inside without the ability to exit or contact anyone by phone. Members of the community ultimately intervened to pry open a board and remove her.

21.    Upon information and belief, the Property was not assessed an abatement charge for the sealing of the Property on this date, likely due to the fact that there were no open violations

on the property at the time; i.e. typically a requirement before L&I would perform such work.  The City decided to take *ultra vires* actions by sealing of the Property without open violations which runs contrary to the City's standard procedures and due process.

22.    A few days later, the City ordered termination of electrical service to the Property without notice to the owner or occupants.  The City's termination of power to the Property resulted in the disabling of all light fixtures, including safety lighting through the property. The otherwise functional commercial fire systems and alarms lost their power, and all temperature controls were crippled. After consulting with and hiring an electrician, power was restored at Ehrlich's expense. Soon after that disconnection, the City issued its *first* formal code violation—alleging that the building was "unfit" for habitation, solely and exclusively due to the absence of electricity, a condition which the City of Philadelphia had, itself, manufactured.

23.    Four to five days after electrical service was restored at Ehrlich's expense, an unidentified City officer entered the Property without a warrant. Upon observing the lights on, the officer shouted, "Hey! You guys aren't supposed to have electric on in here!" Within the week, the City again ordered that the Property's electrical service be disconnected, and the power line was physically severed for a second time—again without any notice to the owner or occupants.

24.    At or around the time the City shut off power a second time without notice, City crews also painted over an approximately a full building mural of value to the Plaintiff, irreparably damaging the south wall of the property. The paint-job caused damage to the wall surface which previously did not exist.

25.    While the damage to the stucco on the side of the building was fully superficial and decorative and did not affect the structural integrity of the Property, the City subsequently cited

the Property for structural issues which Ehrlich alleges were purposely caused by the City's own actions.

26.    The City subsequently cited the Property for structural issues that Ehrlich alleges were purposely by the City's own actions.  The violations cited on the property in response to damage created by City employees was the initial instance of an "unsafe structural condition" violation being cited as to the Property.

27.    In December 2022, ownership was transferred to "A Kensington Joint LLC" ("AKJ"), also a limited liability company in which Ehrlich holds a primary ownership interest.

28.    According to recorded evidence provided by the City, Ehrlich discovered that in year 2022 (before any structural code violations were placed on the Property) a meeting took place in involving at least one (1) member of City Council, the Mayor of the City of Philadelphia[2] (or a representative from the Mayor's Office), and Dr. Bill McKinney ("McKinney") the director of the New Kensington Community Development Corporation ("NKCDC"). These entities held this meeting to discuss Ehrlich's acquisition of the XXX, to form policy, and to find a way to rid Kensington of the building which maintained rights to continue to operate as a business.

29.    Based on the evidence provided by the City, the policy-decision to demolish this building took place prior to any structural code violations.

30.    The decision to demolish the building was based on its reputation as a nuisance coupled with the City's realization that the ownership had changed in favor of AKJ. Upon information and belief, the ownership change led the City and the individually named officials feel empowered to take inappropriate and illegal actions to achieve the desired goal of demolition.

---

[2] At the time of this meeting the serving Mayor was James F. Kenney; though Cherelle Parker had been duly elected as of November 07, 2023.

31.    On or about March 04, 2023, the City of Philadelphia Department of Licenses and Inspections ("L&I") issued a Notice of Violation CF-2023-017143 designating 2837 Kensington Avenue as "unsafe" pursuant to Title 45 of the Philadelphia Code of General Ordinances.

32.    The City of Philadelphia Department of Licenses and Inspections ("L&I") allegedly issued a Final Violation Notice CF-2023-017143 on or about July 11, 2023.

33.    On July 24, 2023, the City of Philadelphia filed a Complaint in Equity with the Court of Common Pleas for the First Judicial District of Pennsylvania Civil Division against Defendants AKJ and Adam Ehrlich alleging numerous violations of the Philadelphia Code of General Ordinances (docketed at July Term 2023, No. 02222).

34.    Concomitant with the Complaint in Equity, The City of Philadelphia also filed an Emergency Petition for Order to Vacate and Demolish the property.

35.    Two days later on July 26, 2023, and without conducting any internal inspection or structural analysis, the emergency judge assigned to the matter (the "Emergency Judge") issued an Order authorizing demolition (the "First Demolition Order"). Importantly, that order did not find Ehrlich personally liable for the assessed costs.

36.    Following evidentiary hearing on July 26, 2023, the Court of Common Pleas, by way of Judge Anne Marie Coyle, entered that emergency order granting the City its requested forms of injunctive relief including inspection of the Property's interior, removal of alleged vagrant individuals from the property and boarding and securing of the property. (Exhibit "A").

37.    On July 27, 2023, Ehrlich and AKJ filed a Notice of Appeal to the Commonwealth Court of Pennsylvania seeking review of the Common Pleas Order dated July 26, 2023, which granted the City of Philadelphia injunctive relief and denied Ehrlich the opportunity to repair the

property (i.e. a remedy significantly less restrictive than the full demolition of the brick structure). Plaintiff was willing, able, and of financial means to have facilitated his desired repairs.

38.    Ehrlich and AKJ filed a counseled Motion to Stay which the Common Pleas Court denied without hearing on August 01, 2023. Meanwhile, later *that same day*, the Commonwealth Court exercised jurisdiction and entered an Order dated August 1, 2023, staying the proceedings in the demolition litigation.  (Exhibit "B"); *See also* City of Philadelphia v. A Kensington Joint, LLC, 301 A.3d 988 (Pa. Commw. Ct.), appeal denied, 309 A.3d 692 (Pa. 2023).

39.    Pivotal is that as of August 1, 2023, Ehrlich and AKJ had successfully obtained a temporary stay of the vacate and demolition order while the appeal was pending. *See* A Kensington Joint, LLC, 301 A.3d at 995-96.

40.    In vacating Judge Coyle's Order, the Commonwealth Court issued its own *Per Curiam* Order dated August 01, 2025. (Exhibit "A").  In an opinion of the Commonwealth Court, it held that the Emergency Judge (Coyle) had afforded undue deference to the City by authorizing demolition without conducting or requiring an internal inspection or structural assessment.  City of Philadelphia v. A Kensington Joint, LLC, 301 A.3d 988, 994 (Pa. Commw. Ct.), appeal denied, 309 A.3d 692 (Pa. 2023).

41.    On August 01, 2025, Ehrlich travelled to the Property and arrived before 10:00 A.M in an effort to photograph, take video and to otherwise document the condition of the property.

42.    First, Ehrlich encountered Sheriff's deputies who he witnessed enter the property and work to vacate individuals from the Property despite the Order of the Commonwealth Court of Pennsylvania.

43.    Around 12 Noon on August 01, 2023, employees of L&I worked to board up and seal the property to prevent entry.

44.     Later that day, after L&I had sealed the building, PPD arrived and ripped open the building and the sealing performed by L&I.

45.     PPD officers entered the building with no lawful purpose or justification.  They lacked a warrant for entry and were not there to vacate individuals.  That had already been accomplished by Sheriff's deputies and L&I.

46.     Despite lawful requests, to date, the PPD has refused to provide a list of Officers on scene for any and all of the events of August 01-02, 2023, as described herein.  Accordingly, the Plaintiff names John/Jane Doe defendants.

47.     Also, despite lawful requests, to date, the Philadelphia Sheriff's Office (PSO) has refused to provide a list of Officers or Sheriff deputies on scene for any and all of the events of either August 1, 2023, or August 02, 2023.

48.     Additionally, under sworn affidavit provided by Defendant LAVANDA HARRIS, the PSO has denied that they have any records pertaining to PSO personnel who were participants of these events, nor that they have any audio or video recordings taken from the days in question, despite there being videographic evidence to the contrary.

49.     Those sworn affidavits from the PSO were made response to Pennsylvania Right-to Know-Law ("RTKL") requests wherein the PSO stated it has no records of the names or badge numbers of the PSO personnel who executed the ejectment of individuals at 2837 Kensington Ave at 10:00 am on August 01, 2023. These documents were signed under penalty of perjury.

50.     On August 02, 2023, after confirmed receipt by the City's Prothonotary Office of the Appellate Court's *Per Curiam* Order, dated August 01, 2023, which stayed the earlier order of Judge Coyle,  Ehrlich again proceeded to the property to ensure the building was not undergoing

demolition.  Ehrlich arrived and was present with multiple copies of the Commonwealth Court's *Per Curiam* Order in hand.

51.    Given the dozens of law enforcement agents and other City of Philadelphia personnel who illegally had entered and travelled throughout the property the previous day (i.e. August 01), Ehrlich wanted to inspect to see if the foot-traffic caused any damage.

52.    With the Demolition Order having been stayed, Mr. Ehrlich, as a member of AKJ also wanted to take photographs and assessments of the Property as to affect any necessary repairs to the Property so as to prevent an unwanted and unnecessary demolition of the Property by the City.

53.    Further, Ehrlich wanted to ensure no tampering or "planting" of contraband had occurred during the subsequent warrantless searches performed by the PPD after the PSO had concluded their sweeps of  the Property on August 01, 2023.

54.    When Mr Ehrlich arrived at his company's Property on August 02, 2023, he discovered that there were two (2) bike officers casually posted on the corner of Kensington Avenue & Hart Lane, about 30 feet away from the front of the Property.  In front of the building, there was a loose chain gate put up by a Construction Company that was not properly secured. Ehrlich then observed that the front door of the Property was both unsecured and fully open to Trespass.

55.    Ehrlich presented the Copy of the *Per Curiam* Order to the officers and requested that they both read and understand it.

56.    Ehrlich was asked what the Order was and informed the Officers that if there were any questions that they should consult City Hall.  After this, Ehrlich proceeded to legally enter his business property.

57.     Shortly after Mr. Ehrlich entered the Property, the unknown Officers who were outside came to the door and ripped it open, demanding that Mr. Ehrlich exit the building. Mr. Ehrlich calmly responded that he had every legal right to be in the property and that they should fully review and understand the Appellate Court *Per Curiam* Order in their hands before taking any further escalatory actions.

58.     Mr. Ehrlich requested a supervisor, and the officers agreed that they would also prefer to wait until a supervisor arrived on scene. Not long after, their supervisor, Sgt RYAN WONG arrived at the Property quickly followed by multiple additional units and PPD Officers.

59.     Mr. Ehrlich and Sgt Wong had talked extensively, without incident, the previous day, August 01, 2023, when all Parties were at the Property in preparation for the 10:00 A.M scheduled eviction (prior to the Appellate Order staying the CCP Order from Judge Coyle).  The conversations had been amicable and, as recorded on the Plaintiff's video, Sgt. WONG confirmed that no illegal drugs, activities, nor blatant drug related paraphernalia were observed by his officers when they and/or the Sheriff's Deputies had searched the property.

60.     Now, when Sgt. WONG arrived at the Property on August 02, 2023, he met with Mr. Ehrlich at the Property's front door and identified himself as the Supervisor and Commanding Officer on the scene.  Sgt. WONG made it expressly clear that he had been made aware of (and had been fully briefed on) the *Per Curiam* Order issued by the Commonwealth Court which had Stayed the lower court's Order issued by Judge Anne Marie Coyle. Sgt. Wong claimed no dispute over the veracity of the legal document.

61.     After talking to Mr. Ehrlich for several minutes, Sgt WONG walked a few feet away from the building's entrance and appeared to be making calls on his phone. Sgt WONG did not

make any additional orders for Mr. Ehrlich to leave the property and apparently wanted to further consult with other City employees before deciding any next steps.

62. Also on scene with Sgt. Wong was Defendant Officer DYLAN MARNOCH, who in camera footage obtained by Ehrlich, can be heard muttering to himself and complaining to fellow officers as to why the Police were even bothering to converse with Ehrlich.

63. On the video, Erlich can be seen closing the front door to the Property while WONG was consulting with other officials via phone. In response, MARNOCH pushed past fellow officers and once again ripped open the front door to the property.

64. Defendant, MARNOCH, was followed by fellow officers and made unwanted physical contact with Ehrlich to include forcefully pushing Ehrlich from the building onto the sidewalk.

65. After being unlawfully and forcefully removed from the Property, at least one (1) other officer continued the assault of the Plaintiff with a hard, painful elbow to or around the Plaintiff's sternum region. Ehrlich suffered other batteries and a strike to the head.

66. Immediately following the assault there was no attempt made to arrest the Ehrlich. Rather, Plaintiff was told that the City did not want him inside the building, but that he was free to stand on the public sidewalk.

67. After Mr. Ehrlich's removal from the building onto the sidewalk, dialogue continued between Mr. Ehrlich and the responding PPD members on tscene. During this time, multiple PPD Officers began passing around a copy of the Judge's Order and immediately claimed it to be a "fake" order.

68. Defendant Brittney REHRIG stated that the *Per Curiam* Order was probably purchased on Facebook Market Place. Next, other officers passed on REHRIG's statement to

additional and newly arriving officers and stated that the Order was indeed (no longer potentially) purchased on Facebook Marketplace and that it was "fake".

69.     In real time, a concerning game of "Whisper Down the Lane" developed, captured on the Officers' own bodycams, as well as by the Plaintiff's video recording equipment.

70.     While the situation was escalating, Sgt. WONG, the Commanding Officer (CO) on the scene, was standing just steps away observing this happen.  Nonetheless, as the Commanding Officer and person with direct knowledge of the *bona fide* nature of the document, WONG failed to take any action to clarify and rectify these false assertions being made and spread by his subordinates.

71.     The pending orders that Sgt. WONG was waiting on were from the Managing Director's Office as well as directly from the Office of the Mayor. Under the City's Charter, neither of these City Agencies are endowed with the powers of law enforcement.

72.     After being dragged out, assaulted, but not arrested, Ehrlich confirmed with the Police Supervisor on the scene, on video, that standing on the Public Easement/Sidewalk in front of the Property was entirely legal and was not in any violation of any laws or legal orders. This was confirmed by Sgt. WONG. No time limit was stated in connection with Mr. Ehrlich's right to be on the public easement.

73.     After about an hour of waiting on the sidewalk, Ehrlich requested to reenter his property but PPD Officers stood between him and the door.

74.     After significant time passed Sgt. WONG gave an order to Ehrlich to move from where he was standing on the sidewalk. Ehrlich asked if it was a lawful order. WONG stated it was lawful and that Ehrlich would be arrested for trespass in the event of non-compliance.

75.    Ehrlich was arrested, in turn, by either WONG, the Defendant, Nicholas LAZAR, or other officers on scene.  The sole reason for the arrest was defiant trespass on a public sidewalk. Later Ehrlich defeated the defiant trespass charge and citation written by LAZAR in court and without the need for hearing. *See* (Exhibit "C" – citation); (Exhibit "D" – disposition).

76.    During the arrest, Ehrlich's valid License to Carry was immediately seized along with his lawfully owned firearm. His concealed carry permit was later revoked by Defendant, Lt. Wanda NEWSOME. (Exhibit "E").

77.    Also, during the course of the arrest, Police took Ehrlich's personal bags without a warrant or probable cause, and failed to document the seizure despite Ehrlich's on-site request to file a police report. Ehrlich possesses video footage capturing the officers taking his bags.

78.    The seized bags contained recently filled prescription medications for Ehrlich and his then (7) year-old autistic daughter. Those medications were never returned, and Ehrlich was unable to obtain replacements from the pharmacy. The bags also contained Ehrlich's legal records, notes, and defense-related documents. Ehrlich believes these privileged materials were accessed and disclosed to the City's legal counsel, who subsequently filed further emergency motions against him and his business interests.

79    Plaintiff was brought to the police station in a police cruiser or wagon. He was detained unlawfully at the station but never fingerprinted or "booked."  Ehrlich was given a violation notice for defiant trespass.  As stated, an appeal was filed and upon information and belief the City Hearing Officer dismissed the appeal. (Exhibit "C").

80.    Consistent with the Commonwealth Court's remanding directives the Court of Common Pleas entered an Order and Rule directing that furthering hearing to take place on August 11, 2023.

81.     After a series of hearings, the Common Pleas Court entered an Order on September 05, 2023, granting the City injunctive relief and further ordering the demolition of 2837 Kensington Avenue. The trial judge, making no distinction between the individual and the LLC, found Ehrlich and AKJ "jointly and *singularly* responsible for payment of all resulting costs".

82.     In the demolition litigation the City of Philadelphia ("the City") assessed nearly $200,000 in costs related to securing and demolishing the Property. This assessment was made despite the absence of any prior adjudication attributing personal liability to Ehrlich.

83.     The City of Philadelphia billed Adam Ehrlich, solely and individually, for an exorbitant amount to cover the cost of Kensington Police for approximately a month and a half. Mr. Ehrlich has numerous photos and videos during this 1.5 month period showing that there was no police presence whatsoever at the Property at various dates and times. Despite these gaps in police coverage, Mr. Ehrlich was fraudulently charged for completely unnecessary, 24 hour police surveillance of the Property, including for the dates during which Judge Coyle's Orders had been stayed by the higher court.

## COUNT I
### UNREASONABLE SEARCH AND SEIZURE
*Plaintiff v. Wong, Marnoch, Rehrig, Lazar and John/Jane Does*

84.     Plaintiff hereby incorporates paragraphs one (1) through thirty-three (33) as if set forth herein more fully at length.

85.     The fundamental purpose of the Fourth Amendment prohibition on unreasonable searches and seizures is to safeguard the privacy and security of individuals against arbitrary invasions by government officials.

86.    The Fourth Amendment imposes a standard of "reasonableness" upon the exercise of discretion by government officials. Reasonableness, an inherently flexible standard, generally requires balancing the intrusion on the individual's Fourth Amendment interests against the promotion of legitimate government interests.

87.    At all times relevant hereto, the named Defendants were acting under the color of state law.

88.    Defendants intentionally and deliberately refused to release Plaintiff from custody, and continued their prolonged, unlawful seizure of the Plaintiff, even though with reasonable diligence it could have been discovered the Commonwealth Court Order staying the demolition order was valid.

89.    Officer LAZAR and JOHN DOES escalated the situation into a custodial detention on August 02, 2023, by placing Ehrlich in handcuffs and seizing his person without probable cause.

90.    The custodial detention was not predicated on probable cause and served no legitimate governmental interest.

91.    Once handcuffed, Ehrlich was not free to leave.

92.    Upon placing handcuffs on Ehrlich's person, Officers LAZAR and JOHN DOE officers illegally seized Plaintiff's person in violation of his Fourth Amendment right to be secure in his person.

93.    No probable cause existed to arrest Ehrlch. There was no trespass.

94.    No probable cause existed to search Ehrlich's personal effects to include his bags. Moreover, there was no warrant, appropriate order, or probable cause to justify the intrusion of PPD into the Property on August 01, 2023.

95.    As a direct and proximate result of the actions and policies of the Defendants, Plaintiff has been caused to suffer unlawful imprisonment and to further suffer damages through no fault or act of her own.

## <u>COUNT II</u>
## FALSE ARREST/FALSE IMPRISONMENT
### *Plaintiff v. Wong, Marnoch, Rehrig, Lazar, and John & Jane Doe Officers*

96.    Plaintiff re-alleges and incorporates by reference paragraphs one (1) through ninety-five (95) as set forth above.

97.    Where a police officer lacks probable cause to make an arrest, the arrestee has a claim under section 1983 for false imprisonment based on a detention pursuant to that arrest. <u>Groman v. Township of Manalapan</u>, 47 F.3d 628, 636 (3d Cir.1995). A false imprisonment claim under section 1983 is based on the protection of the Fourteenth Amendment against deprivations of liberty without due process of law. <u>Gerstein v. Pugh</u>, 420 U.S. 103, 125 (1975). <u>Baker v. McCollan</u>, 443 U.S. 137, 142 (1979).

98.    Plaintiff's Fourth and  Fourteenth Amendment rights were violated when he was arrested without probable cause, detained, and transported from the situs or the arrest for further detention.

99.    Defendants imposed by force and forceful contact an unlawful restraint upon Plaintiff's freedom of movement and Plaintiff was conscious of the confinement.

100.    Plaintiff was subjected to great humiliation, pain, and suffering by reason of the false and malicious arrest, detention, seizure, holding, and imprisonment of the Plaintiff as aforesaid.

### COUNT III
### FALSE ARREST – PURSUANT TO PENNSYLVANIA STATE LAW
*Plaintiff v. Wong, Marnoch, Rehrig, Lazar, and John & Jane Doe Officers*

101.    Plaintiff re-alleges and incorporates by reference paragraphs one (1) through one hundred (100) as set forth above.

102.    Under Pennsylvania law, the torts of false arrest and false imprisonment are essentially the same actions." Glass v. City of Phila., 455 F.Supp.2d 302, 365 (E.D.Pa.2006). Plaintiff must show that he was unlawfully detained by another person. Manley v. Fitzgerald, 997 A.2d 1235, 1241 (Pa.Commw.Ct.2010).

103.    Here, the Defendants intentionally and/or recklessly arrested the Plaintiff on a public sidewalk knowing there was no cause or justification for the detention and arrest. Plaintiff was thus falsely and wrongfully imprisoned/incarcerated against his will.

104.    Plaintiff was willfully detained within a bounded area without justification.

105.    Plaintiff was subjected to great humiliation, pain, and suffering by reason of the false and malicious arrest, detention, seizure, holding, and imprisonment of the Plaintiff as aforesaid.

106.    By reason of the acts of Defendants, the Plaintiff has incurred damages, including emotional distress, damage to his reputation and attorney's fees in an amount that continues to accrue.

107.    Plaintiff's Fourth and Fourteenth Amendment rights were violated when he was falsely arrested and falsely imprisoned by Officer Marnoch and John/Jane Doe officers.

108.    The warrantless arrest of Ehrlich was not constitutionally valid.

109.    Namely, at the time Ehrlich was arrested (i.e. placed into custodial detention) there were no facts within the knowledge of the officers which were sufficient to warrant a prudent man in believing that Ehrlich had committed or was committing an offense

110.    The Defendant officers had knowledge that there was no probable cause to support taking Ehrlich into custody.

111.    Following the frightening assault and detention, PPD cited Ehrlich with defiant trespass and baselessly charged him in an attempt to justify their illegal seizure of his person, their use of excessive force as described below, and the resulting false arrest.

## COUNT IV
## EXCESSIVE FORCE
*Plaintiff v. Marnoch, Lazar and John & Jane Doe Officers*

112.    Plaintiff re-alleges and incorporates by reference paragraphs one (1) through one hundred-eleven (111) as set forth above.

113.    The use of unreasonable force during an arrest, an investigatory stop, or any other "seizure" of a person at liberty violates the Fourth Amendment and is actionable under the federal Civil Rights Act. Graham v. Connor, 490 U.S. 386, 390 (1989).

114.    "A cause of action exists under § 1983 when a law enforcement officer uses force so excessive that it violates the Fourth...Amendment to the United States Constitution. Groman v. Twp. Of Manalapan, 47 F.3d 628, 633-34 (3d. Cir. 1995). Police may employ reasonable force, if necessary, to effectuate lawful arrest. Michigan v. Summers 452 U.S. 692 (1981). If there is no probable cause to arrest or search, there can be no justification for the use of any force.

115.    As set forth herein, Ehrlich was unlawfully arrested.

116.    During the encounter with police, Ehrlich was struck in the chest by an elbow and later injured his head. He sustained multiple bruises and abrasions to his arms and legs. He suffered a chest wall contusion.

117.    There was no justification for the chest strikes resulting in a chest wall contusion and abrasion which required medical attention.

118.    Acting under the color of state law, Officer Marnoch and John/Jane Doe officers worked a denial of Plaintiffs rights secured by the Fourth Amendment.

119.    Specifically, the Defendants intentionally battered the Plaintiff and put him in fear of imminent, harmful contact and further assaults.

### COUNT V
### ASSAULT AND BATTERY – PURSUANT TO PENNSYLVANIA STATE LAW
*Plaintiff v. Officer Marnoch, Officer Lazar, and Officers John & Jane Does*

120.    Plaintiff re-alleges and incorporates by reference paragraphs one (1) through one hundred-nineteen (119) as set forth above.

121.    On August 02, 2023, the Defendants, Officer Marnoch, Officer Lazar, and John/Jane Doe officers, intentionally caused offensive contact to Plaintiff's person without privilege.

122.    Though true that sworn officers of the law retain privilege to commit a battery during the effectuation of a lawful arrest the Defendants' conduct exceeded that privilege and is not protected by said privilege.

123.    The Defendants, during his course of offensive and unwanted contacts with the Plaintiff, caused Plaintiff to reasonably believe that he would immediately suffer further batteries.

124.    There was no justifiable reason to strike the Plaintiff in the head and chest under the circumstances.

125.    Defendants have committed an intentional tort in their individual capacities.

126.    As a result of the intentional and offensive contact, the Plaintiff has suffered damages.

**<u>COUNT VI</u>**
**DEPRIVATION OF PROPERTY INTEREST – UNLAWFUL SEIZURE**
**SUSPENSION OF CONCEALED CARRY PERMIT**
*Plaintiff v. City of Philadelphia, Marnoch, Lazar, and Lt. Wanda Newsome*

127.    Plaintiff re-alleges and incorporates by reference paragraphs one (1) through one hundred twenty-six (126) as set forth above.

128.    The Second Amendment, as applied to the states through the Fourteenth Amendment, protects an individual's right to keep and bear arms for self-defense. <u>District of Columbia v. Heller</u>, 554 U.S. 570, 595 (2008); <u>N.Y. State Rifle & Pistol Ass'n v. Bruen</u>, 597 U.S. 1 (2022).

129.    At the time of the arrest on August 02, 2023,  Ehrlich lawfully possessed a firearm and had a valid license to carry that firearm ("LTCF").

130.    During the course of the arrests Defendants Marnoch and Lazar seized the valid permit, firearm and ammunition, without justification, probable cause, a warrant, or exigent circumstance.

131.    Following the seizure, the PPD revoked Plaintiff's LTCF on the date of August 04, 2023, on the basis of "good cause" and "character and reputation" without affording Plaintiff prior notice, a statement of reasons, or an opportunity to be heard

132.    Defendants' seizure of Plaintiff's firearm and revocation of his LTCF deprived him of the ability to keep and bear arms for self-defense and home protection, without due process of law.

133.    Although Plaintiff's firearm was eventually returned, Defendants retained his ammunition - lawfully owned bullets.

134.    In order to recover his property, Ehrlich was forced to file motions for return of property, incurring legal expense and effort to regain what had been unlawfully seized.

135.    Defendants acted under color of state law, and their actions were taken pursuant to the (1) City policy or custom of arbitrarily suspending LTCFs and confiscating firearms from lawfully licensed owners absent lawful justification; and/or (2) the PPD policy or custom of arbitrarily suspending LTCFs and confiscating firearms from lawfully licensed owners absent lawful justification.

136.    The arbitrary seizure and continued retention of Plaintiff's ammunition, as well as the revocation of his LTCF on spurious grounds and without due process, infringed upon Plaintiff's right to possess functional arms for self-defense.

137.    Defendants acted under color of state law. The City of Philadelphia  and the Office of the Sheriff are liable under <u>Monell v. Dep't of Soc. Servs</u>., 436 U.S. 658 (1978), because these actions were taken pursuant to an unconstitutional policy or custom of confiscating firearms and revoking LTCFs without adequate procedural protections

138.    The Philadelphia Sheriff's Office, as the issuing authority for LTCFs under 18 Pa.C.S. § 6109, acted under color of state law and deprived Plaintiff of his Second and Fourteenth Amendment rights by revoking his LTCF without notice or a hearing.

139.    Ehrlich' LTCF remains impaired and he is not permitted to apply for a new one until his original license expires sometime in 2027.  The constitutional deprivation is ongoing.

140.    As a direct and proximate result of Defendants' unconstitutional conduct, Plaintiff was deprived of his Second and Fourteenth Amendment rights and suffered harm, including the inability to lawfully exercise his right to armed self-defense and legal expense to secure the return of his property together with emotional distress and other damages as will be proven at trial.

**COUNT VII**
**VIOLATION OF THE TAKINGS CLAUSE**
*Plaintiffs v. City of Philadelphia*

141.    Plaintiffs re-alleges and incorporate by reference paragraphs one (1) through one hundred forty (140) as if set forth herein more fully at length.

142.    The Takings Clause of the Fifth Amendment, applicable to the states through the Fourteenth Amendment, provides that private property shall not "be taken for public use, without just compensation."

143.    At all relevant times, A Kensington Joint LLC ("AKJ") held legal title to 2837 Kensington Avenue. Plaintiff Ehrlich was the managing member and majority owner of AKJ, personally invested in the acquisition and maintenance of the property, and—by judicial order dated September 5, 2023—was held personally liable for all demolition-related costs before any veil-piercing discovery had taken place. Ehrlich therefore possessed a direct, vested financial interest in the property and bore the personal economic burden of the City's actions. *See* City of Phl. v. A Kensington Joint, LLC July Term 2023, No. 02222); (Order of September 05, 2023, finding Ehrlich and AKJ "jointly and singularly responsible for payment of all resulting costs"). (Exhibit "F").

144.    On or before August 01, 2023, Defendants engaged in deliberate actions that deprived Plaintiff of the beneficial use of the Property, including:

> a. Boarding and sealing the Property without inspection or lawful cause while occupants were inside;

> b. Ordering termination of electricity without notice, thereby manufacturing violations rendering the Property "unfit for habitation"; and

> c. Initiating demolition proceedings and obtaining emergency orders without affording Plaintiff proper notice or opportunity to be heard.

145.    On September 5, 2023, Judge Anne Marie Coyle entered an order granting the City of Philadelphia exclusive possession of the property and prohibiting Ehrlich from being present on or occupying the property. This order remains in effect as of the filing of this Complaint. (Exhibit "F").

146.    Following demolition of the longstanding brick structure, the property was reduced to a vacant lot stripped of its unique, grandfathered adult-use rights that had made it economically valuable. The combination of demolition and the continuing exclusive possession order has deprived Plaintiff of all viable economic use, income, or ability to alienate the property.

147.    These actions, undertaken pursuant to City policy were not a legitimate exercise of police power to abate an actual nuisance, as the property had lawfully operated as an adult bookstore/cabaret for decades without any open code violations at the time of the City's intervention.[3] The City's true motive was to eliminate a lawful but disfavored land use without providing constitutionally required compensation.

---

[3] Labeling a lawful business a "nuisance" does not immunize the government from takings liability where its actions amount to physical appropriation or total destruction of property value. *See* Lucas v. S.C. Coastal Council, 505 U.S. 1003, 1029 (1992) ("[A] State, by *ipse dixit*, may not transform private property into public property without compensation."); *see also* Armstrong v. United

148.    Defendants' conduct amounts to both a physical taking—because the City has exercised exclusive possession of the property (Cedar Point Nursery v. Hassid, 141 S. Ct. 2063 (2021))—and a total regulatory taking, because Ehrlich has been deprived of all economically beneficial use (Lucas v. S.C. Coastal Council, 505 U.S. 1003 (1992)).

149.    Defendants' conduct was arbitrary, pretextual, and not a valid exercise of police power, because it was carried out as part of a pre-planned effort to remove the Property without lawful process.

150.    The City acted pursuant to a policy of using code enforcement and utility shutoffs as a means to effectuate demolition of targeted properties, circumventing lawful procedures for notice and hearing.

151.    As a direct and proximate result, Plaintiffs have suffered the loss of property value, destruction of his reasonable investment-backed expectations, lost business income, loss of rental income, and out-of-pocket costs incurred due to the City's actions. Defendants have never provided just compensation as required by the Fifth and Fourteenth Amendments. Plaintiffs have been deprived of the use, value, and income of the Property without just compensation, in violation of the Fifth and Fourteenth Amendments

<u>**COUNT VIII**</u>
**VIOLATION OF PROCEDURAL DUE PROCESS**
*Plaintiffs v. City of Philadelphia, Mayor Cherelle Parker,*
*former Mayor James F. Kenney, Lt. Wanda Newsome*

152.    Plaintiffs reallege and incorporate by reference paragraphs one (1) through one hundred-fifty-one (151) as if set forth fully herein.

---

States, 364 U.S. 40, 49 (1960) (Takings Clause is designed to prevent the government from forcing some people alone to bear public burdens which should be borne by the public as a whole.).

153. The Fourteenth Amendment prohibits states and municipalities from depriving any person of life, liberty, or property without due process of law.

154. Protected property interests include real property ownership and lawful possession, as well as government-issued licenses when state law provides criteria limiting official discretion. Board of Regents v. Roth, 408 U.S. 564, 577 (1972); Barry v. Barchi, 443 U.S. 55 (1979).

155. On or before August 2, 2023, Plaintiff, as majority owner and manager of A Kensington Joint LLC, held a protected property interest in 2837 Kensington Avenue, including its use, inventory, zoning and licensing status, the income it generated, and future income.

156. Here, the Defendants deprived Plaintiffs of this property interest by:

a. Boarding and sealing the Property without inspection, notice, or lawful cause while occupants remained inside;

b. Ordering the termination of electricity without notice, manufacturing violations to justify enforcement; and

c. Initiating emergency demolition proceedings without providing adequate notice or opportunity to contest the actions before a neutral decisionmaker.

157. Defendants also suspended Ehrlich's License to Carry Firearms (LTCF) without affording him prior notice, a statement of reasons, or an opportunity to be heard, depriving him of both a protected property and liberty interest.

158. These actions occurred without pre-deprivation process and without any prompt post-deprivation hearing to contest the City's actions, violating fundamental requirements of due process. Mathews v. Eldridge, 424 U.S. 319, 333 (1976); Bell v. Burson, 402 U.S. 535, 539 (1971).

159. The deprivation of Plaintiffs' property and license rights was not random or unauthorized, but rather was the product of municipal policy or custom, making the City and

Sheriff liable under <u>Monell v. Dep't of Soc. Servs.</u>, 436 U.S. 658 (1978), and <u>Pembaur v. City of Cincinnati</u>, 475 U.S. 469, 480–81 (1986).

160.    As a direct and proximate result of these constitutional violations, Plaintiff suffered loss of property value, loss of income, loss of firearm rights, emotional distress, and other damages.

**COUNT IX**
**VIOLATION OF SUBSTANTIVE DUE PROCESS**
*Plaintiffs v. City of Philadelphia, Mayor Cherelle Parker,*
*former Mayor James F. Kenney, Lt. Wanda Newsome*

161.    Plaintiffs reallege and incorporate by reference paragraphs one through one hundred sixty (160) as if set forth fully herein.

162.    The Fourteenth Amendment protects individuals from arbitrary and capricious government action that deprives them of property interests in a manner that "shocks the conscience." <u>County of Sacramento v. Lewis</u>, 523 U.S. 833, 846–47 (1998).

163.     On or before August 2, 2023, Defendants engaged in arbitrary and abusive actions against Plaintiff and his property, including:

> a. Boarding and sealing 2837 Kensington Avenue without any inspection, notice, or legal justification while occupants were inside;
>
> b. Cutting electricity to the Property without notice, thereby manufacturing code violations to justify enforcement;
>
> c. Initiating demolition proceedings and obtaining emergency orders without requiring any internal inspection or structural analysis; and
>
> d. Seizing Plaintiff's firearm, ammunition, and LTCF during an unlawful arrest, followed by suspension of his LTCF without notice or hearing.

164.    These actions were not undertaken in furtherance of legitimate public health or safety goals, but rather as part of a pre-planned effort to remove Plaintiff's building by any means necessary regardless of constitutional constraints.

165.    Defendants' conduct, individually and collectively, was so egregious, oppressive, and shocking to the conscience that it violated Plaintiff's substantive due process rights under the Fourteenth Amendment.

166.    Defendants acted pursuant to a policy of arbitrary enforcement and unlawful property deprivation, for which the City, Mayor Parker, and former Mayor Kenney are liable under Monell v. Dep't of Soc. Servs., 436 U.S. 658 (1978), and Pembaur v. City of Cincinnati, 475 U.S. 469 (1986).

167.    As a direct and proximate result of Defendants' unconstitutional actions, Plaintiff suffered deprivation of property, loss of liberty, economic harm, and emotional distress.

### COUNT X
### CONSPIRACY TO DEPRIVE CIVIL RIGHTS
*Plaintiffs v. Defendants*

168.    Plaintiffs allege and incorporate by reference paragraphs one (1) through one hundred sixty-seven (167) as if set forth fully herein.

169.    Defendants, including officials within the City of Philadelphia, the Philadelphia Police Department, the Department of Licenses and Inspections, and the Philadelphia Sheriff's Office, entered into an agreement and understanding to deprive Plaintiff of his constitutional rights to property, due process, and to keep and bear arms.

170.    As part of this agreement, Defendants pre-planned to remove 2837 Kensington Avenue "by any means necessary," including manufacturing code violations,

arbitrarily cutting power, obtaining emergency demolition orders without lawful process, and targeting Ehrlich for arrest while he attempted to lawfully assert his property rights.

171.    Overt acts in furtherance of the conspiracy included:

    a.    Boarding and sealing the Property without lawful inspection or notice;

    b.    Cutting electricity to create a pretext for code violations;

    c.    Seeking emergency demolition orders without internal inspection or structural analysis;

    d.    Arresting and assaulting Plaintiff on August 2, 2023, seizing his firearm and LTCF, and subsequently suspending his LTCF without due process or "good cause";

    e.    False swearing under oath by Lavanda Harris

    f.    Denials of lawful RTKL requests by Lavanda Harris

    g.    Conspiring to withhold and deny access to Public Records and police video through violations of Pennsylvania's RTKL and Act 22.

172.    These actions were undertaken jointly by Defendants acting under color of state law, and were motivated by the shared objective of depriving Plaintiff of constitutional rights and forcing demolition of the Property despite an active Commonwealth Court stay.

173.    As a direct and proximate result of this conspiracy, Plaintiffs suffered violations of Second, Fourth, Fifth, and Fourteenth Amendment rights, loss of property, and other damages.

## SUMMARY OF MUNICIPAL LIABILITY

174.    At all relevant times, the City of Philadelphia maintained a policy that was the moving force behind the constitutional violations described herein.

175.    This case arises from the City of Philadelphia's unprecedented use of code enforcement, utility shutoffs, and emergency court orders as tools to dispossess Plaintiff of a lawful business property. The City demolished a structure that had operated continuously as a licensed adult bookstore/cabaret for decades, despite the absence of open code violations at the time. Following demolition, the City obtained a court order granting itself exclusive possession of the land, prohibiting Plaintiff from accessing or using his own property. These actions, taken without just compensation, constitute a *de facto* taking in violation of the Fifth and Fourteenth Amendments.

176.    These policies or customs included, but were not limited to:

a.    Authorizing the boarding and sealing of properties without inspection or lawful notice;

b.    Terminating utilities to properties without notice to create code violations;

c.    Seeking emergency demolition orders without structural inspections or due process;

d.    Seizing firearms and suspending Licenses to Carry Firearms ("LTCFs") without lawful cause, notice, or hearing; and

e.    Targeting Plaintiff for arrest and property deprivation despite his lawful possession of a Commonwealth Court stay order

f.    Covering up video in possession of the PSO by way of the false swearing of affidavits to obscure video in possession of the PSO.

g.    Demolishing the Property after the expiration of the L&I issued Demolition Permit

177.    Policymakers with final authority, including senior officials at the Department of Licenses and Inspections, the Law Department, the Mayor's Office, Office of the Managing

Director, the PPD and the PSO, personally planned, approved or ratified these actions, making the municipality liable under Pembaur v. City of Cincinnati, 475 U.S. 469, 480–81 (1986).

178.    Defendants with deliberate indifference to the constitutional rights of property owners and LTCF holders by maintaining these policies and customs, which foreseeably resulted in the violations suffered by Plaintiff.

## CONCLUSION

179.    These actions, individually and collectively, deprived Ehrlich of his constitutional rights under the Second, Fourth, Fifth, and Fourteenth Amendments, and constitute actionable violations under 42 U.S.C. § 1983

## DEMAND FOR TRIAL BY JURY OF TWELVE

180.    The Plaintiff hereby demands trial by jury on all claims stated in this Amended Complaint.

## DEMAND FOR PUNITIVE DAMAGES

181.    The conduct of the Defendants, as described in this Complaint, was outrageous, willful, wanton, and performed with reckless disregard for Plaintiff's constitutional rights. Defendants acted deliberately to deprive Plaintiff of his liberty, property, and Second Amendment rights, and did so as part of a pattern and practice of unlawful enforcement tactics. Because Defendants' conduct was undertaken with evil motive or callous indifference to Plaintiff's federally protected rights, Plaintiff seeks an award of punitive damages against the individual Defendants, in their individual capacities, to punish and deter similar conduct in the future.

**DEMAND FOR RELIEF**

181.    Plaintiff, by and through undersigned counsel, respectfully requests that this Court grant a monetary award, compensatory damages, and punitive damages, together with interest, fees, costs and attorneys' fees pursuant to 42 U.S.C § 1988 and other applicable shifting statutes and principles and any other such relief this Court deems just and equitable to include the reversal of Defendant's revocation of Plaintiff's License to Carry a Firearm.

Respectfully submitted,

**THE LAW OFFICES OF
DANIEL A. PALLEN P.L.L.C.**

By: Daniel A. Pallen, Esquire
114 W. Front Street
Media, PA 19063
(484) 550-7542
(484) 550-7532 *fax*
dpallen@pallenlaw.com